## Case No. 7,958.

### KYNOCH v. The S. C. IVES.

[Newb. 205.] [1]

District Court, N. D. Ohio. Nov., 1856.

ADMIRALTY JURISDICTION—EXECUTORY CONTRACTS—EQUITABLE TITLE WITHOUT POSSESSION—GENERAL JURISDICTION TO ADMINISTER RELIEF.

1. The contract in this case is an executory contract for the purchase of a vessel; conveying no legal title to the libelant, but simply investing him with an equitable interest. The court of admiralty will not hold an equitable title sufficient to justify its interposition against the legal title to obtain possession, although it may sometimes deem such an equitable interest sufficient to restrain it from interference from an existing possession under it.

[Cited in The Amelia, 23 Fed. 406.]

2. Where one has a mere equitable title without having possession under it, held, that admiralty had no jurisdiction to sustain a libel for possession.

[Cited in Hill v. The Amelia, Case No. 6,487; The C. C. Trowbridge, 14 Fed. 876; Wenberg v. Cargo of Mineral Phosphate, 15 Fed. 287.]

3. Courts of admiralty have no general jurisdiction to administer relief as courts of equity. They cannot entertain a libel for specific performance, to correct a mistake, to give relief against fraud, &c. Andrews v. Essex Fire & Marine Ins. Co. [Case No. 374].

[Cited in Deely v. The Ernest & Alice, Case No. 3,735; Wenberg v. Cargo of Mineral Phosphate, 15 Fed. 288; Paterson v. Dakin, 31 Fed. 684.]

4. The jurisdiction of the district court of the United States, under the ninth section of the judiciary act of 1789 [1 Stat. 76], embraces all cases of a maritime nature, whether they be particularly of admiralty cognizance or not. They are not embarrassed by the restraining acts of Richard II. and Henry IV., but are governed by the principles of maritime law recognized in maritime nations of continental Europe.

5. The twenty-second rule in admiralty, prescribing the mode of procedure in petitory and possessory suits requires a joint proceeding in rem, and in personam.

[Cited in Atkins v. Fibre Disintegrating Co., Case No. 600.]

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[1] [Reported by John S. Newberry, Esq.]

6. To allow a libel in such a case to be amended so as to proceed for damages in personam, would be inconsistent with the established rules of admiralty practice.

[Cited in The Monte A., 12 Fed. 338.]

The libel was filed August 6th, 1856, and sets forth that on the 9th day of May, 1856, the claimant, Wm. C. Neilson, being the owner of the propeller S. C. Ives (then called the Dick Tinto), entered into a contract for the sale to the libelant, of one-half of said propeller, her steam pump, submarine armors, &c., of which contract the following is a copy: "This agreement made this 9th day of May, 1856, by and between William C. Neilson of the city of Cleveland, in the county of Cuyahoga, and state of Ohio, of the first part, and John Kynoch, of the city of Buffalo, county of Erie, and state of New York, of the second part, witnesseth: That the said party of the first part hereby agrees to sell and convey to the said party of the second part, or to any other person whom the said Kynoch may designate, on or before the first day of July, 1856, one undivided half of the steam propeller Dick Tinto, as by enrollment number thirty-eight, of the district of Cuyahoga, at Cleveland aforesaid; the said propeller to be fully fitted and in order for wrecking, having on board all the appurtenances, consisting of boats, anchors and chains, lines, tools and such other small articles as are usually required by a boat in the wrecking business, and her condition as such to be approved by Jonathan Austin, marine inspector at said city of Buffalo, and such undivided half to be delivered at Buffalo aforesaid; also, one undivided half of the Worthington steam pump, now owned by the party of the first part; also, one undivided half of two submarine armors, with pumps, hose, lines and everything appertaining thereto; also, one undivided half of seven heavy screws used for wrecking; in consideration of which agreement to sell and convey, the said party of the second part hereby agrees to pay to the said party of the first part the sum of seven thousand and six hundred dollars, in manner following, that is to say: One thousand dollars on or before the first day of July, 1856, two hundred and fifty dollars on the first day of September, 1856, two hundred and fifty dollars on the first day of December, 1856, two thousand and one hundred dollars on the first day of July, 1857, two thousand dollars on the first day of July, 1858, and two thousand dollars on the first day of July, 1859, with interest on the said sums to be paid on the first days of July, 1857, 1858, and 1859, at the rate of six per cent. per annum from and after the first day of July, 1856, until the said payments are made. In witness whereof we have hereunto set our hands the day and year first above written. (Signed) Wm. C. Neilson. John Kynoch. In presence of Benj. H. Austin, Jr." Annexed to this contract was a guaranty by Neilson as to the net earnings of Kynoch's moiety. The libel further alleged that as a part of the consideration of said contract, it was agreed that Kynoch should have the sole charge and management of the propeller, and that she should be employed in the business of wrecking: that the propeller had been fitted out according to the contract, payment tendered by the libelant, and possession and a conveyance of a moiety demanded, but that said Neilson refused to make any conveyance or give possession, declaring it to be his intention to send the propeller on a voyage to the St. Clair river, beyond the reach of libelant. The libel, therefore, prayed process against the propeller, and a decree for the possession, offering to give bonds pendente lite for her safe return to abide the decree, and also for a monition to Neilson to show cause why he should not be required to perform, all and singular, the undertakings to his agreement.

To this libel, exceptions to the jurisdiction of the court were filed by Willey & Cary, proctors for claimants, on a preliminary hearing of which the court refused to grant possession to the libelant, but ordered possession to be redelivered to the claimant Neilson, on his entering into the usual stipulation, with sureties, &c.

Willey & Cary, in support of the exceptions, insisting, on the final hearing:

I. That the agreement upon which the libel proceeded was not a maritime contract in contemplation of admiralty. 1 Conk. Adm. 9; De Lovio v. Boit [Case No. 3,776].

II. That the agreement was executory. Story, Cont. § 18; Story, Sales, § 296; 2 Kent, Comm. § 496.

III. That the court in admiralty will not take cognizance of contracts preliminary to maritime contracts, or entertain a proceeding for the specific performance of executory contracts, or dispossess a party holding the legal title on the application of a party representing a mere equitable title. The Pitt, 1 Hagg. Adm. 240; 4 Hagg. Adm. 277; The New Draper, 4 C. Rob. Adm. 287; 5 C. Rob. Adm. 161; Curt. Adm. Dig. 17; Davis v. Child [Case No. 3,628]; Montgomery v. Wharton [Id. 9,737]; [Montgomery v. Henry] 1 Dall. [1 U. S.] 49; The Tribune [Case No. 14,171]; The Crusader [Id. 3,456]; Andrews v. Essex Fire & Marine Ins. Co. [Id. 374]; 1 Kent, Comm. 370; Alberti v. The Virginia [Case No. 141]; The Fairplay [Id. 4,615]; The Perseverance [Id. 11,017]; Dean v. Bates [Id. 3,704].

IV. That the court will not allow a libel to be so amended as to engraft a proceeding in personam upon a proceeding in rem, and that it would be irregular to combine them. 2 Conk. Adm. 613; The Orleans, 11 Pet. [36 U. S.] 175.

S. B. & F. J. Prentiss and Austin, of Buffalo, for libelant, cited 2 Kent, Comm. §§ 468, 477, 492; 13 Eng. Com. Law, 199; Chit.

Cont. 374, 375, and note; Barrett v. Goddard [Case No. 1,046]; 2 Bl. Comm. 448; The Tribune [supra]; and reviewed the cases cited for claimant.

WILLSON, District Judge. The libel in this case, partakes much of the character of a bill in chancery, which seeks to enforce the specific performance of a contract, for the purchase of property. It also seeks the further object of obtaining, for the libelant, the possession and control of the propeller S. C. Ives.

The only question in the case, is, has this court jurisdiction of the subject matter of the suit? As a preliminary inquiry, it is proper to examine and determine the effect of the contract referred to in the libel, upon the title to the moiety of the vessel claimed to be purchased; or in other words, to determine the question whether Kynoch obtained by the contract, a legal, or only an equitable title to the property. This depends upon the character the law gives to the agreement itself. If it is an executed contract, then the legal title passed by the instrument to Kynoch; if it is an executory contract, then only an equitable title passed. The law declares that "a contract is executed when nothing remains to be done by either party, and when the transaction is completed the moment the agreement is made. An executory contract is an agreement to do some future act." Story, Cont. § 15. "If anything remains to be done, as between the seller and buyer, before the goods are to be delivered, a present right of property does not attach to the buyer." 2 Kent, Comm. 495. This is a well established principle in the doctrine of sales. We must look, then, to the contract itself. to learn the intention of the parties, and to determine its legal effect as to the passing of title to the property in presenti.

In the contract it is stipulated in these terms: "That the said party of the first part (Neilson) hereby agrees to sell and convey to the party of the second part (Kynoch), or to any other person whom the said Kynoch may designate, on or before the first day of July, 1856, one undivided half of the steam propeller 'Dick Tinto,' &c., the said propeller to be fully fitted and in order for wrecking, having on board all the appurtenances, consisting of boats, anchors, chains, &c., and such other small articles as are usually required by a boat in the wrecking business, and her condition as such to be approved by Jonathan Austin, marine inspector," &c. There are two distinct features in this agreement which give it the unmistakable stamp of an executory contract. One is, the provision for the subsequent act of Austin in giving his approval of the requisite condition of the vessel; and the other, the palpable intention of the parties that the legal title should remain in Neilson until Kynoch should designate whether it should be conveyed to himself or to some other person. Suppose Neilson failed to equip the vessel, and the consequent disapproval of Austin of her condition followed; could it be claimed that Kynoch, on the first of July, would be obliged to receive the bill of sale and be bound for the payment of the purchase money? Certainly not. Such a proposition would be as absurd as the hypothesis that Neilson could, after the execution of the contract, convey the legal title to a third person when that title was in Kynoch. In the interpretation of written contracts, the courts are bound to ascertain and declare the intention of the parties to them. Now, I apprehend, that by the well settled rules of the construction of written instruments, the purchase of the vessel here by Kynoch was contingent. If the propeller should be fitted out by Neilson suitable for wrecking by the first of July; and if such fitting out and equipment should be approved by Austin; and if after such equipment and approval, the moiety should be delivered at Buffalo, then Kynoch agreed to purchase and pay the consideration named in the contract. To perfect the sale and purchase, these things were to be done in the future by Neilson, which if not done discharged the vendee from the terms of the purchase, and this negatives the possibility of legal title in the purchaser. I am clear that Kynoch obtained by the agreement only an equitable interest in the vessel. If the libelant, then, has only an equitable title to the property, how stands this suit? We have in the record the case presented: First, an equitable owner, not in possession, seeking by a proceeding in rem, the interposition of a court of admiralty to give control of the vessel; and second, a demand upon a court of admiralty to decree the specific performance of a contract for the purchase of vessel property.

It has long been settled that a court of admiralty will not hold an equitable title sufficient to justify its interposition against a legal title to obtain possession, although it may sometimes deem such an equitable interest sufficient to restrain it from interference with an existing possession under it. The province of the admiralty is to carry into effect the declarations of the maritime law. Titles to ships and vessels depend chiefly upon the maritime law, as recognized and enforced in the common law. It is laid down by Godolphin, and also by Brown and in Clerke's Praxis, that suits in admiralty touching property in ships, are of two kinds; one called petitory suits, in which the mere title to the property is litigated and sought to be enforced, independently of any possession which has accompanied or sanctioned that title; the other, called possessory suits, which seek to restore to the owner the possession, of which he has been unjustly deprived, when that possession has followed a legal title, or as it is sometimes phrased, when there has been a possession under a claim of title with a constat of property.

I am aware, that so far as the question of jurisdiction is concerned, this distinction between petitory and possessory suits has never obtained recognition by the courts in this country. The early decision of Judge Story in the case of De Lovio v. Boit [Case No. 3,-776], furnished an authority which has been acted upon with confidence by the courts ever since. And this distinction has lately been substantially abolished even in England by the 3 & 4 Vict., entitled "An act to improve the practice and extend the jurisdiction of the high court of admiralty" in England. But with all this growing liberality and modern favor towards the jurisdiction of the courts, it has never been held or claimed anywhere, that in contests between part owners of a ship for possession or disputes about title, the admiralty would entertain jurisdiction to support an equitable title for either purpose. Possession must follow the legal title, and that title lies at the foundation of the jurisdiction. It belongs to other tribunals to establish the legal title, and when that is done, such title brings with it all its incidents in controversies between part owners in courts of admiralty. Upon the first proposition, therefore, I hold that the libelant, not having had possession of the propeller, cannot, upon a mere equitable title, come into this court and ask possession and control of the vessel. In the second place, can the demand made in this libel for the specific performance of the contract in question, be enforced in the admiralty?

Courts of admiralty have no general jurisdiction to administer relief as courts of equity. If a maritime contract is broken, the admiralty, concurrent with courts of law, can only give damages for the breach of it; whereas the chancery may compel the party, in some cases, to a specific performance. A court of admiralty has no more power to decree such specific performance, than it has to set aside the contract for fraud, or correct a mistake, or decree the execution of a trust. These are matters properly subject to the cognizance of courts of equity and not of the admiralty. Both courts have their origin in the polity of the civil law. From the time the Rhodian Code was incorporated into the Pandects, the maritime law has ever been declared in written ordinances and codes of maritime regulations. The admiralty courts had no power to modify or change them. On the contrary the praetors of Rome exercised jurisdiction in cases where there was no written law to govern them, and granted relief where, by the enforcement of the written law, equity and good conscience would be perverted. In the Pandects it is said: "Jus autem civil, est, quod ex legibus, plebiscitis, senatus consultis, decretis principium, auctoritate prudentium venit. Jus praetorium est, quod praetores introduxerunt, adjuvandi, vel supplendi, vel corrigendi juris civilis propter utilitatem publicam; quod et honorium diciter, ad honorem pretorium sic nominatum."

Such departure from written ordinances and codes of maritime regulations was never known in courts of admiralty, although, as to form, their course of proceeding has always been in accordance with the Roman law.

But the decisions of our own courts are decisive of the question. In the case of Andrews v. Essex Fire & Marine Ins. Co. [Case No. 374], Mr. Justice Story broadly declares that courts of admiralty cannot entertain a libel for specific performance, or to correct a mistake, or to grant relief against fraud. Courts of admiralty, he says, "have jurisdiction over maritime contracts when executed, but not over those leading to the execution of maritime contracts. If there were a contract to build a ship, or to sign a shipping paper, or to execute a bottomry bond, and the party refused to perform it, the admiralty cannot take jurisdiction and enforce its performance. But if the contract be maritime and executed, the jurisdiction attaches; and the admiralty may then administer relief upon it according to equity and good conscience. The law looks to the proximate, and not to the remote cause, as the source of jurisdiction, and deals with it only when it has assumed its final shape as a maritime contract. Such being the rules of law governing the admiralty jurisdiction of this court, it follows that we have not cognizance of the subject matter of this suit in a proceeding in rem. But it was claimed by the counsel for the libelant, in the argument, that the contract of purchase being maritime, the case should be retained and proceeded with in personam upon the question of damages for a breach of the contract. It is, perhaps, unnecessary to determine whether this contract is, in its nature, maritime or not.

There has been some diversity and conflict of opinion as to the import and meaning of the word maritime as expressed in the clause of the constitution and in the judiciary act, to wit, "all causes of admiralty and maritime jurisdiction." By some it has been contended that the term maritime thus incorporated in the constitution and the act of congress, is but an unmeaning expletive, inserted merely to round a period, and that it should be used and applied synonymous with the term admiralty as understood in England. By others (and I apprehend with greater weight of authority) it has been insisted that the term so used, has a substantive meaning, and thereby conferred upon the federal courts a more enlarged and extended jurisdiction than was conceded by the common law judges to the high court of admiralty in England. Under our constitution we are not subject to the necessity of following the fluctuating line which divided the jurisdiction of the courts of law and of the admiralty in Great Britain during the days of Lord Coke, and for a long period after his time. We look to the powers conferred in

the commissions from the crown upon the judges of the vice admiralty courts in this country under the colonial system, and the consequent extent of jurisdiction exercised by those courts, and the state admiralty courts under the Confederation, to ascertain the true meaning of the words used in the constitution, giving to the federal courts "all causes of admiralty and maritime jurisdiction." The conclusions arrived at by every intelligent jurist, will be those declared by Mr. Justice Washington in the case of Davis v. The Seneca [Case No. 3,651], viz.: that the judicial power of the United States under the constitution, and the jurisdiction of the district courts under the 9th section of the judiciary act of 1789, embrace all cases of a maritime nature, whether they be particularly of admiralty cognizance or not; and, that this jurisdiction, and the law regulating its exercise, are to be sought for in the general maritime law of nations, and not confined to that of England or of any particular maritime country. The district courts of the United States, sitting as courts of admiralty, are not embarrassed by the restraining statutes of Richard II. and Henry IV., but exercise a large jurisdiction, and are governed by the same principles of maritime law, as are recognized by the courts of admiralty in the maritime nations of continental Europe.

I have thus plainly stated my views as to the extent of the admiralty jurisdiction of this court, that, from the decision necessarily made in the present suit, no misapprehension should exist of the purpose of the court to exercise that jurisdiction in all cases of maritime contracts, when they properly arise. The obstacle in the way here is not necessarily in the character of the contract, but in the mode of procedure claimed by counsel. The twenty-second rule in admiralty prescribed by the supreme court of the United States, directs the mode of procedure in all petitory or possessory suits between part owners or adverse proprietors of a ship. It declares the process shall be an arrest of the vessel and by a monition to the adverse party to appear and make answer to the suit. The rule requires a joint proceeding in rem and in personam. The libel is the foundation for the action of the court, and it determines the character of the decree. It cannot be amended to change the form of the action any more than a proceeding in the common law action of ejectment could be changed into an action of trespass. Such, however, would be the case if the suit should now be allowed to proceed in personam. An amended libel seeking damages for a breach of the contract would be the virtual institution of a new suit, and a novelty in admiralty practice.

The exceptions to the jurisdiction of the court are sustained, and the libel dismissed without prejudice.